305 P.3d 452

**HAWAIIAN ASSOCIATION OF SEVENTH–DAY ADVENTISTS, A Hawaiʻi Non–Profit Corporation, Respondent/Plaintiff–Appellant–Cross–Appellee,**

v.

**Stacey T.J. WONG, As Trustee of the Eric A Knudsen Trust, Petitioner/Defendant–Appellee–Cross–Appellant.**

**No. SCWC–28592.**

Supreme Court of Hawaiʻi.

June 28, 2013.

---

Michael D. Tom, Lyle M. Ishida, and David R. Harada–Stone, Honolulu, for petitioner.

Michael R. Marsh, James M. Cribley, and Mark G. Valencia, Honolulu, for respondent.

RECKTENWALD, C.J., NAKAYAMA, and McKENNA, JJ.; with POLLACK, J., Dissenting Separately, with whom ACOBA, J., joins.

Opinion of the Court by McKENNA, J.

## I. Introduction

Hawaiian Association of Seventh–Day Adventists, a Hawaiʻi non-profit corporation ("SDA"), filed suit seeking, among other things, a declaration that its rental of cabins to the public is permissible under its lease agreement with the Eric A. Knudsen Trust ("Lease"). Stacey T.J. Wong, as trustee of the Eric A. Knudsen Trust ("Wong"), counterclaimed for termination of the Lease and other remedies. The circuit court, inter alia, granted summary judgment in favor of Wong on SDA's claim regarding cabin rentals, but granted summary judgment in favor of SDA on Wong's claims for termination and equitable relief. The Intermediate Court of Appeals ("ICA") vacated summary judgment as to the issue of cabin rentals, opining that such use of the Property is permissible under the terms of the Lease, and remanded the case for further proceedings.

We conclude that the ICA correctly vacated the court's judgment in favor of Wong on SDA's claim regarding cabin rentals (Count I of the Complaint), but for the wrong reasons. Contrary to the parties' stipulation and the ICA's conclusion, we hold that Paragraph 16 of the Lease, which delineates permissible uses of the Property, is ambiguous. If, on remand, the fact-finder determines that Paragraph 16 prohibits the use of cabins by the general public, Wong may be entitled to damages for breach of contract and/or disgorgement of profits. The ICA therefore also erred in affirming summary judgment in favor of SDA on Wong's claims for breach of contract and unjust enrichment (Counts II and III of the Counterclaim). We conclude that the ICA correctly vacated the circuit court's order awarding attorneys' fees and costs to Wong; we also, however, vacate the ICA's order awarding costs on appeal to SDA because a prevailing party has yet to be determined. Except for Wong's claim for termination of the Lease (Count I of the Counterclaim), on which the ICA properly affirmed summary judgment, we therefore vacate the ICA's Judgment on Appeal and remand this case for further proceedings consistent with this opinion.

## II. Background

### A. Factual Background

The subject 200–acre parcel of land ("Property") is part of a 940–acre parcel located in Koloa, Kaua'i, originally owned by the Augustus F. Knudsen Trust and the Eric A. Knudsen Trust (collectively, "the Trusts"). In 1949, the Trusts leased the Property to Valdemar L'Orange Knudsen who, in turn, assigned the lease to Kahili Mountain Park, Inc. ("KMPI"), a company owned by several beneficiaries of the Trusts. KMPI subsequently constructed campgrounds and facilities, including cabins that it rented to the general public as vacation residences. This area became known as Kahili Mountain Park ("the Park").

Beginning in 1982, KMPI negotiated to sell its capital stock and its leasehold interest in the Park to SDA, which planned to construct a school on part of the Property. SDA closed its acquisition of KMPI's outstanding stock in 1984, at which point the 1949 lease was assigned to SDA, KMPI was dissolved, and a new lease was negotiated with the Trusts.

On December 31, 1984, SDA and the Trusts executed a new sixty-year lease, effective January 1, 1985. Paragraph 16 of the subject Lease delineates allowable uses of the Property as follows:

16. Use of Demised Premises. The demised premises shall be used only for educational, recreation (including vacation residence for members and staff of Lessee's school and church), agricultural, health care and humanitarian uses. No dwellings shall be constructed or used on the demised premises except for faculty, administrative staff, students and employees. If Lessee ceases to use the demised premises for the above purposes, Lessor shall have the right to terminate this Lease.

Paragraph 26 of the Lease is a nonwaiver clause, which gives SDA an thirty-day window to remedy any alleged breach:

26. Nonwaiver. Acceptance of rent by Lessor or its agent shall not be deemed to

be a waiver by Lessor of any breach by the Lessee of any term, covenant or condition of this Lease herein contained, nor of Lessor's right to declare and enforce a forfeiture for any such breach, and that the failure of Lessor to insist upon strict performance of any of the terms, covenants or conditions of this Lease, or to exercise any option herein conferred in any one or more instances shall not be construed as a waiver or relinquishment for the future of any such terms, covenants, conditions or options, but the same shall be and remain in full force and effect; PROVIDED, HOWEVER, that before any forfeiture shall be enforced, Lessor shall give written notice to Lessee of the breach constituting the ground of forfeiture, and Lessee shall have thirty (30) days from the date of such notice within which to remedy or cure such breach, and if such breach shall be so cured or remedied, then such breach shall be waived and no forfeiture shall be enforced for such breach. . . .

SDA's principal objective in leasing the Property was to develop and operate a kindergarten through twelfth-grade school ("School"). After obtaining the necessary permits, SDA developed the Property, opened its new School, and constructed houses for faculty and staff. In addition, SDA continued KMPI's practice of renting cabins to the public, used the rental income to support the School, and constructed additional cabins pursuant to permits previously obtained by KMPI.[1]

Between 1984 and 2000, the Trusts were aware of SDA's continued vacation rentals to the public. There was no communication from the Trusts that these rentals might violate the Lease. By late 2000, however, three major changes occurred: Valdemar L'Orange Knudsen, who had been a strong supporter of the School, died; the Augustus F. Knudsen Trust terminated and the Eric A. Knudsen Trust ("EAK Trust") acquired a hundred-percent fee interest in the Property; and the trustee for EAK Trust changed from First Hawaiian Bank to Wong.

---

1. SDA constructed a total of 17 additional cabins, in addition to the 25 cabins that were in existence when KMPI sold its leasehold interest.

Of these 42 structures, approximately 31 were available for vacation rental prior to March 2002, when SDA ceased its rentals.

In an April 4, 2001 letter to SDA, Wong asserted that "the Adventists are in material default of the Kahili Adventist School/Mountain Park lease with respect to the Permitted Uses provision." Wong did not explain how SDA had violated the Lease or ask SDA to cease its practice of renting cabins to the public. He warned, however, that he could pursue several legal remedies against SDA including termination of the Lease, eviction from the Property, and a suit for monetary damages and legal fees. Wong stated that he supported SDA's vision of enhancing the property, and he hoped that they could work together to achieve this mission, fulfill the Property's potential, and satisfy the past breach. Using SDA's financial statements from June 1984 to January 2000, Wong calculated that SDA owed $642,551.33 in unpaid rent, based on a rate of ten percent of gross revenues from SDA's cabin rentals. Wong proposed that SDA prepare a detailed five-year business plan for expanding the Park, enter into a new lease that would permit commercial use of the Property, and pay EAK Trust ten percent of gross non-School related revenues.

SDA retained a consultant to prepare a five-year business plan and evaluate Wong's proposal for expansion; however, it refused to make retroactive payment of percentage rents. Wong rejected SDA's business plan and characterized its failure to tender payment as "evidence of bad faith." In a letter dated March 6, 2002, Wong demanded that SDA cease "all commercial vacation rental operations" and pay "an amount equal to ten percent (10%) of the gross revenues received by [SDA] from the commencement of the commercial vacation rental operations in 1985 until the date such operations cease pursuant to this demand," plus a ten percent interest rate and general excise tax.

On March 13, 2002, SDA notified Wong that it would cease renting cabins to the public in order to avoid termination of the Lease. SDA maintained, however, that rental of the cabins to the public was a permitted recreational use. It also noted that ceasing rentals would cause significant monetary losses and could result in SDA closing its

School. SDA immediately ceased booking reservations for cabins but, pursuant to an agreement with Wong, continued to honor reservations that had been made before March 6, 2002.

## B. Circuit Court Proceedings

On March 10, 2003, SDA filed a Complaint in the Circuit Court for the Fifth Circuit ("circuit court"),[2] seeking a declaratory judgment that its operation of the Park, including commercial uses of the Property and rental of cabins to the public as vacation residences, was permitted under the Lease ("Count I of the Complaint"). SDA also alleged that the Lease had been orally amended to permit continued rental of the cabins ("Count II of the Complaint"); that Wong's allegations of breach were barred by waiver and estoppel based on the Trusts' knowledge of these rental activities ("Count III of the Complaint"); and that Wong should be enjoined from threatening to terminate the Lease and interfering with the cabins rentals, since these actions would seriously and irreparably damage SDA ("Count IV of the Complaint"). In addition, SDA sought damages for Wong's wrongful demand that SDA halt its vacation rentals to the public ("Count VI of the Complaint"). The Complaint did not contain a Count V.

On April 1, 2003, Wong filed an Answer and Counterclaim, seeking termination of the Lease on the ground that SDA had violated its terms by conducting prohibited commercial operations on the Property ("Count I of the Counterclaim"). In addition, Wong claimed an entitlement to damages based on SDA's breach of contract, its failure to comply with the conditions for use, and its refusal to pay rent for its commercial operations ("Count II of the Counterclaim"). He also claimed that SDA had been unjustly enriched by its commercial operations on the Property, and sought disgorgement of the profits therefrom ("Count III of the Counterclaim"). Finally, he alleged that SDA was obligated to defend and indemnify Wong for any loss or damage in connection with the Lease ("Count IV of the Counterclaim").

---

2. The Honorable Kathleen N.A. Watanabe presided.

The parties each filed multiple motions for partial summary judgment.[3] With respect to Count I of the Complaint (cabin rentals), the parties stipulated that the Lease is unambiguous, parol evidence is inappropriate, and the court's interpretation should be limited to the four corners of the agreement.

Wong argued that Paragraph 16 clearly prohibits use of the Property by anyone other than faculty, administrative staff, students, and employees. While maintaining that the Lease is unambiguous, Wong cited letters and committee reports from School representatives in support of his position that Paragraph 16 never contemplated rental of cabins to the public. He also submitted deposition testimony from individuals who had been involved in discussions regarding SDA's use of the Property before the Lease was finalized.

SDA, on the other hand, argued that permissible uses of the Property include educational, agricultural, humanitarian, recreational, or health care, and the Lease does not prohibit use of the Property by the public

for any of these permitted purposes. It maintained that the parenthetical reference to "vacation residence" provides an example of recreational use, while the subsequent reference to "dwellings" is a limitation only as to those individuals who could permanently reside on the Property. SDA argued that Wong improperly cited opinion evidence from individuals who were neither involved in drafting the Lease nor qualified to make legal conclusions regarding interpretation of its terms. It contended that, if parol evidence were considered, communications pertaining to the negotiation and execution of the Lease expressly contemplated expansion of the existing cabin rental operations to generate income for the School.

With respect to Count I of the Counterclaim (termination), Wong acknowledged that the law disfavors forfeitures and that the Lease provides SDA thirty days to cure any violation. Relying on *Food Pantry v. Waikiki Business Plaza,* 58 Haw. 606, 575 P.2d 869 (1978),[4] and *Aickin v. Ocean View Investments Co.,* 84 Hawai'i 447, 935 P.2d 992 (1997),[5] however, he argued that the court

**3.** The parties filed a total of nine summary judgment motions: (1) [SDA's] Motion for Partial Summary Judgment on Count I of the Complaint (Cabin Rentals), filed July 28, 2005; (2) [SDA's] Motion for Partial Summary Judgment on Counts II and III of the Counterclaim (Percentage Rents), filed August 10, 2005; (3) [SDA's] Motion for Partial Summary Judgment on Count I of the Counterclaim (Termination), filed August 10, 2005; (4) [SDA's] Motion for Partial Summary Judgment on Counts I, II and IV of the Counterclaim (Failure to Exhaust Administrative Remedies), filed August 25, 2005; (5) [SDA's] Motion for Partial Summary Judgment on Count IV of the Counterclaim (Indemnity), filed August 25, 2005; (6) [Wong's] Motion for Summary Judgment with Respect to Count I of the Complaint, filed, August 17, 2005; (7) [Wong's] Motion for Summary Judgment with Respect to Counts II, III, IV, and VI of the Complaint, filed August 17, 2005; (8) [Wong's] Motion for Summary Judgment Based Upon [SDA's] Violation of the Lease, filed August 17, 2005; and (9) [Wong's] Motion for Partial Summary Judgment with Respect to Count VI of the Complaint, filed August 24, 2005.

**4.** In *Food Pantry,* lessee sought a declaratory judgment regarding its assignment and subleasing of the premises without prior written consent from lessor, and lessor sought termination of the lease based on breach of a nonassignment provision. 58 Haw. at 608, 575 P.2d at 873. The trial court concluded that lessee had materially

breached the lease, and lessor was entitled to damages based upon the fair market rental for the premises; the court, however, refused to terminate the lease as long as lessee cancelled the assignments and subleases or, alternatively, paid a higher rental for the remainder of the term. *Id.* at 613, 575 P.2d at 875.

On appeal, we held that the trial court was empowered to grant equitable relief to relieve a party from forfeiture and the court had not abused its discretion in refusing to terminate the lease. 58 Haw. at 613–14, 575 P.2d at 875–76 ("Equity does not favor forfeitures, and where no injustice would thereby be visited upon the injured party, equity will award him compensation rather than decree a forfeiture against the offending party.").

**5.** In *Aickin,* tenants who failed to timely renew a commercial lease, sought declaratory judgment restraining lessor from terminating the lease. 84 Hawai'i at 449–51, 935 P.2d at 994–96. After conducting a bench trial, the circuit court concluded that tenants had materially breached the lease by failing to timely exercise an option to extend, and lessor was entitled to possession of the premises. *Id.* at 451–52, 935 P.2d at 996–97.

This court held that tenants were entitled to equitable relief if they could show: (1) their conduct was not intentional, willful, or grossly negligent; (2) lessor did not rely to its detriment on the failure to give notice; (3) strict enforce-

should exercise its powers in equity to terminate the Lease as a result of SDA's willful violations. In opposition, SDA contended that termination was inappropriate under paragraph 26 of the Lease where, upon receiving written notice from Wong, SDA timely cured any alleged violation by ceasing its rental of cabins to the public.

With respect to Counts II and III of the Counterclaim (breach of contract and unjust enrichment), Wong argued that SDA violated the Lease by impermissibly renting cabins to the public and he was therefore entitled to a remedy for such breach, either in the form of reimbursement of revenues or disgorgement of profits. SDA argued, inter alia, that relief for an alleged breach was limited to the express terms of the Lease (i.e., notice and opportunity to cure, followed by termination); that a claim for percentage rents assumes the parties would have agreed to such a clause at the time the Lease was signed; that the Lease contained no provision for monetary damages; and that Wong did not suffer any damages from the alleged breach.

After a hearing, the circuit court issued orders granting summary judgment in favor of Wong on Counts I through IV of the Complaint (cabin rentals, oral amendment, estoppel, and injunctive relief), and granting summary judgment in favor of SDA on Count VI of the Complaint (damages)[6] and Counts I through IV of the Counterclaim (termination, breach of contract, unjust enrichment, and indemnification). The court did not elaborate on the grounds for its decision, and SDA filed motions for clarification and reconsideration. At a hearing on these motions, the court explained that it had

found no ambiguity in the Lease and, therefore, had not considered parol evidence in making its decision. It then denied both motions.

Wong then filed a motion for costs and attorneys' fees. SDA argued that Wong was not entitled to fees and costs because it had prevailed on two of the four main issues before the court: termination of the Lease and retroactive payment of percentage rents. The circuit court concluded that Wong was entitled to reasonable attorneys' fees and costs because he had prevailed on the disputed main issue in the Complaint (i.e., cabin rentals). It therefore awarded Wong $60,270.00 in fees and $27,206.90 in costs.

On May 21, 2007, the court entered its Amended Final Judgment, disposing of all claims against the parties as follows: granting summary judgment in favor of Wong on Counts I through IV of the Complaint (cabin rentals, oral amendment, estoppel, and injunctive relief); granting summary judgment in favor of SDA on Counts I through IV of the Counterclaim (termination, breach of contract, unjust enrichment, and indemnification); dismissing Count VI of the Complaint (damages);[7] awarding reasonable attorneys' fees and costs to Wong; and dismissing all claims and counterclaims not specifically identified therein.

## C. The ICA Opinion

SDA appealed the court's judgment granting summary judgment in favor of Wong on Count I of the Complaint (cabin rentals), arguing, among other things, that rental of cabins to the public is a permissible recreational use, and that the Lease does not

ment of the notice provision would result in unconscionable hardship to tenants; and (4) the delay in giving notice was not unreasonably long within the context of the lease itself. 84 Hawai'i at 455–56, 935 P.2d at 1000–01. We noted that the lease had not yet expired when tenants gave notice of their intent to renew, the four-month delay was not unreasonably long in the context of a ten-year lease, and the failure to timely exercise the option was an oversight; on this basis, we concluded that the circuit court had abused its discretion by refusing to apply equitable principles and extend the lease. Id. at 455, 935 P.2d at 1000.

6. SDA had not moved for summary judgment on this count, and this ruling appears to contradict

the court's ruling in favor of Wong on Count I of the Complaint (vacation rentals). It appears that the circuit court recognized this contradiction by later dismissing Count VI in its Amended Final Judgment. See n.7, infra, and accompanying text.

7. As the ICA notes, it is unclear why the court dismissed Count VI of the Complaint (damages), even though it had earlier granted summary judgment in favor of SDA, and there was no subsequent stipulation by the parties or decision by the court. SDA, however, did not appeal this count.

otherwise prohibit SDA from engaging in commercial activities on the Property.[8]

Wong cross-appealed the court's judgment granting summary judgment in favor of SDA on Counts I, II, and III of the Counterclaim (termination, breach of contract, and unjust enrichment), arguing that he was entitled to terminate the Lease because SDA's rental of cabins to the public was a persistent and willful material breach, and that he was entitled to monetary damages as compensation for SDA's improper use of the Property.

In a Memorandum Opinion dated April 16, 2012, the ICA concluded that the Lease does not prohibit SDA from renting cabins to the public as vacation residences. The ICA opined that "[t]he first sentence of Paragraph 16 does not authorize or exclude use of the Property by [SDA] or any particular class of individuals" and "nothing in the text suggests that [SDA] is prohibited from collecting revenue from the permissible use of the Property." While acknowledging that the second sentence of Paragraph 16 limits the use of "dwellings" to faculty, staff, students and employees of SDA, it concluded that this restriction does not apply to use of the Property for "vacation residence," which is an expressly permitted recreational use. The ICA concluded, however, that although it was undisputed that at least some of the cabins were being used as vacation residences rather than permanent dwellings, the record contained very little about what the cabins looked like, how they were used, and who used them. Accordingly, the ICA concluded that it could not grant summary judgment in favor of SDA, and remanded the case to the circuit court for further proceedings on this issue.

The ICA affirmed the circuit court's decision as to the remaining counts of the Complaint and Counterclaim. It concluded, inter alia, that termination of the Lease was not warranted because SDA had cured any alleged breach by ceasing cabin rentals to the public within thirty days of receiving written notice from Wong, and that Wong was not entitled to monetary damages because the

circuit court had erred in concluding that SDA's cabin rentals were prohibited by the Lease. Finally, the ICA vacated the order awarding attorneys' fees and costs to Wong because, in remanding the case to the circuit court, a prevailing party had yet to be determined.

SDA then filed a motion for attorneys' fees and costs. On June 8, 2012, the ICA issued an order denying SDA's request for attorneys' fees and granting its request for costs in the reduced amount of $16,377.92. It concluded that SDA was not entitled to attorneys' fees because a prevailing party had yet to be determined, but an award of costs was appropriate because SDA had prevailed on appeal.

### D. Questions on Certiorari

Wong raises the following questions on certiorari:

A. Whether the ICA gravely erred in vacating the Circuit Court's grant of summary judgment in favor of Wong on Count I of [SDA's] Complaint seeking a declaratory judgment that "continued operation of 'Kahili Mountain Park' and vacation rental of the cabins . . . is permitted by the terms of the lease."

B. Whether the ICA gravely erred in affirming the Circuit Court's grant of summary judgment in favor of SDA on Count I of Wong's Counterclaim for termination of the lease on the ground that [SDA] willfully violated Paragraph 16 of the lease by renting cabins to the general public.

C. Whether the ICA gravely erred in affirming the Circuit Court's grant of summary judgment in favor of SDA on Counts II and III of Wong's Counterclaim seeking damages for breach of contract and unjust enrichment, respectively.

D. Whether the ICA gravely erred by vacating the Circuit Court's Order Granting Fees and Costs and paragraph 4 of the Amended Final Judgment awarding Wong attorneys' fees and costs.

---

8. Although the court also granted summary judgment in favor of Wong on Counts II, III and IV of the Complaint (oral amendment, estoppel, and injunctive relief), SDA did not appeal these portions of the court's judgment.

## III. Standard of Review

A motion for summary judgment is reviewed de novo, viewing the evidence in the light most favorable to the nonmoving party, under the same standard applied by the trial court. *State v. Tradewinds Elec. Serv. & Contracting,* 80 Hawai'i 218, 222, 908 P.2d 1204, 1208 (1995); *Foytik v. Chandler,* 88 Hawai'i 307, 313–14, 966 P.2d 619, 625–26 (1998). *See also* Hawai'i Rules of Civil Procedure Rule 56.

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Pacific Int'l Serv. Corp. v. Hurip,* 76 Hawai'i 209, 213, 873 P.2d 88, 92 (1994) (citation omitted). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Guajardo v. AIG Hawai'i Ins. Co.,* 118 Hawai'i 196, 201, 187 P.3d 580, 585 (2008) (citation omitted).

## IV. Discussion

### A. Count I of SDA's Complaint (Cabin Rentals)

SDA and Wong both maintain that Paragraph 16 of the Lease is unambiguous and enforceable.[9] They disagree, however, on the effect of Paragraph 16's parenthetical reference to "vacation residence" and the subsequent restriction on "dwellings." Wong contends that SDA's rental of cabins to the public violates the terms of the Lease because it constitutes use of a dwelling by someone other than faculty, administrative staff, students, and employees. SDA, on the other hand, argues that the use of cabins as vacation residences by the public is expressly permitted as a recreational use and is distinguishable from the use of permanent dwellings.

### 1. Principles of Contractual Interpretation

"[T]he construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court." *Brown v. KFC National Mgmt. Co.,* 82 Hawai'i 226, 239, 921 P.2d 146, 159 (1996) (citations and internal quotation marks omitted). "The determination whether a contract is ambiguous is likewise a question of law that is freely reviewable on appeal." *Id.* (citations omitted).

Contract terms are interpreted according to their plain, ordinary, and accepted sense in common speech. *Cho Mark Oriental Food v. K & K Intern.,* 73 Haw. 509, 520, 836 P.2d 1057, 1064 (1992). The court's objective is "to ascertain and effectuate the intention of the parties as manifested by the contract in its entirety." *Brown,* 82 Hawai'i at 240, 921 P.2d at 160 (citation and internal quotation marks omitted).

A contract is ambiguous when its terms are reasonably susceptible to more than one meaning. *Airgo v. Horizon Cargo Transp.,* 66 Haw. 590, 594, 670 P.2d 1277, 1280 (1983). As a general rule, the court will look no further than the four corners of the contract to determine whether an ambiguity exists. *State Farm Fire & Cas. Co. v. Pac. Rent–All,* 90 Hawai'i 315, 324, 978 P.2d 753, 762 (1999) (noting that the parties' disagreement as to the meaning of a contract does not render it ambiguous). The parol evidence rule "precludes the use of extrinsic evidence to vary or contradict the terms of an unambiguous and integrated contract." *Pancakes of Hawai'i v. Pomare Props. Corp.,* 85 Hawai'i 300, 310, 944 P.2d 97, 107 (App.1997) (citation omitted). This rule, however, is subject to exceptions that permit the court to consider extrinsic evidence when the writing in question is ambiguous or incomplete. *Id.* Where there is any doubt or controversy as to the meaning of the language, the court is permitted to consider parol evidence to explain the intent of the

9. Wong nevertheless offers certain extrinsic evidence "to explain and reinforce the unambiguous use provision in Lease." SDA argues, however, that Wong's reliance on select pieces of inadmissible parol evidence is misleading where the Lease is unambiguous and the proffered evidence does not accurately reflect the intent of the parties at the time the Lease was executed.

parties and the circumstances under which the agreement was executed. *Hokama v. Relinc Corp.*, 57 Haw. 470, 476, 559 P.2d 279, 283 (1977). The court may admit parol evidence to explain an ambiguity, whether latent or patent:

> In determining whether or not an ambiguity exists in a document, under the parol evidence rule, the test lies not necessarily in the presence of particular ambiguous words or phrases but rather in the purport of the document itself, whether or not particular words or phrases in themselves be uncertain or doubtful in meaning. In other words, a document may still be ambiguous although it contains no words or phrases ambiguous in themselves. The ambiguity in the document may arise solely from the unusual use therein of otherwise unambiguous words or phrases. An ambiguity may arise from words plain in themselves but uncertain when applied to the subject matter of the instrument. In short, such an ambiguity arises from the use of such words of doubtful or uncertain meaning or application.

*Hokama*, 57 Haw. at 474–75, 559 P.2d at 282 (citations omitted) (emphasis added).

### 2. Paragraph 16's Use Provisions Are Ambiguous

 As pointed out earlier, the parties stipulated that the Lease is unambiguous. We note, however, that the parties' stipulation as to a question of law is not binding on the court, and does not relieve us from the obligation to review questions of law de novo. *Chung Mi Ahn v. Liberty Mut. Fire Ins. Co.*, 126 Hawai'i 1, 10, 265 P.3d 470, 479 (2011) (citations omitted).

The main issue before this court is whether Paragraph 16 of the Lease prohibits SDA's practice of renting cabins, as vacation residences, to members of the public not affiliated with the Church or School. Paragraph 16 provides:

> 16. Use of Demised Premises. The demised premises shall be used only for educational, recreation (including vacation residence for members and staff of Lessee's school and church), agricultural, health care and humanitarian uses. No dwellings

shall be constructed or used on the demised premises except for faculty, administrative staff, students and employees. If Lessee ceases to use the demised premises for the above purposes, Lessor shall have the right to terminate this Lease.

Paragraph 16 begins by enumerating five permissible uses of the Property. The first sentence states: "The demised premises shall be used only for educational, recreation (including vacation residence for members and staff of Lessee's school and church), agricultural, health care and humanitarian uses." Focusing on the parenthetical phrase in this sentence, the ICA construed the word "including" as a term of enlargement, and concluded that the reference to vacation residence was intended as an example of permissible recreational use rather than a limitation thereof. In doing so, the ICA relied upon *Lealaimatafao v. Woodward–Clyde Consultants*, 75 Haw. 544, 556–57, 867 P.2d 220, 224 (1994).

In *Lealaimatafao*, this court addressed the scope of the wrongful death statute, which provided damages for "pecuniary injury and loss of love and affection, including ... loss of parental care, training guidance, or education, suffered as a result of the death of the person by ... any person wholly or partly dependent upon the deceased person." 75 Haw. at 550–51, 867 P.2d at 223–24 (emphasis added). Citing a definition from *Black's Law Dictionary* 763 (6th ed. 1990), this court focused on the term "including" and explained:

> The term, "including" expresses "an enlargement and has the meaning of and or in addition to, or merely specifies a particular thing already included within the general words theretofore used." By using the term "including," the legislature intended the enumerated claims to be exemplary of the type of claims which may be brought for the loss of love and affection. The term "including" in no way implies exclusivity. Thus it is irrelevant whether Appellants are entitled to any of the enumerated claims inasmuch as they have a general claim for the loss of love and affection.

75 Haw. at 556, 867 P.2d at 226 (brackets omitted).

*Lealaimatafao* involved statutory interpretation, not contractual interpretation. More importantly, in *Lealaimatafao*, this court relied upon only one of several definitions of the term "including." According to the definition from *Black's Law Dictionary*, however, "including" can construed to express limitation as well as expansion, and interpretation of that term depends upon context. *Black's Law Dictionary* 763 (6th ed. 1990) (" 'Including' within statute is interpreted as a word of enlargement or of illustrative application as well as a word of limitation."). Thus, with respect to the first sentence of Paragraph 16, the parenthetical reference could indicate a limitation on how vacation residences may be used for recreational purposes by a particular category of persons.

■ In addition, while *Lealaimatafao* involved statutory construction, "expressio unius est exclusio alterius" is a fundamental canon of contractual interpretation. *See* Edwin W. Patterson, *The Interpretation and Construction of Contracts,* 64 COLUM. L. REV. 833, 853–55 (1964). Under this principle, the express mention of a particular provision may imply the exclusion of that which is not included. *Tsunoda v. Young Sun Kow,* 23 Haw. 660, 665 (Haw.Terr.1917) ("A reservation or exception may be implied from the language of the lease, although not expressly mentioned, where the language used shows such intent." (Citations omitted.)).[10] If the parties had intended to identify vacation residence as an example of recreational use, they could have done so without referring to a particular category of persons entitled to use those vacation residences.[11] It is therefore unclear whether the parenthetical phrase states a limitation on who may use the Property as vacation residences, and the sentence is particularly ambiguous when read in context.

The following sentence of Paragraph 16 states: "No dwellings shall be constructed or used on the demised premises except for faculty, administrative staff, students and employees." The ICA acknowledged that the term "dwellings" was ambiguous insofar as it could refer broadly to a structure in which people live (as Wong contends) or, more specifically, to a place of primary or permanent residence (as SDA contends). It concluded, however, that the term was unambiguous within the context of the Lease.

■ Contract terms are interpreted according to their plain, ordinary, and accepted sense in common speech. *Cho Mark Oriental Food,* 73 Haw. at 520, 836 P.2d at 1064. Where terms are undefined, the court may resort to legal or other well-accepted dictionaries to determine their ordinary meaning. *Sierra Club v. Hawai'i Tourism Auth.,* 100 Hawai'i 242, 253, 59 P.3d 877, 888 (2002). The ICA noted that because vacation residence was a permissible recreational use of the Property, it would be unnatural to read the subsequent restriction as a limitation thereof, and "dwellings" must therefore be construed to mean "primary, non-recreational residences" rather than temporary or short-term vacation residences.

This analysis begs the question of whether a vacation residence constitutes a type of dwelling which, absent the parenthetical phrase, would be restricted to faculty, administrative staff, students, and employees. Given this ambiguity in the term "dwellings," it is possible that Paragraph 16's restriction on the construction and use of "dwellings" states the general rule, while the parenthetical reference to "vacation residence" provides a limited exception thereto. Under this interpretation, Paragraph 16 could reasonably be construed to allow members and staff of SDA's School and Church-including those who might not be permitted to use dwellings-to use the Property for short-term vacation

---

10. In *Tsunoda,* this court applied the rule "expressio unius est exclusio alterius" and held that, where a lease contemplated the use of water for irrigation of lands and lessee's domestic purposes, the parties intended to except any surplus water from operation of the lease. 23 Haw. at 665.

11. Reading the parenthetical as the dissent does, without explaining the import of this language, renders the reference "to members and staff of Lessee's school and church" superfluous.

residence, but to prohibit such use by the general public.

The dissent suggests that interpreting "dwellings" to encompass "vacation residence" would be illogical and inconsistent. Dissent at 17–24. We respectfully disagree, because the parenthetical phrase in the first sentence entitles a broader subset of individuals to use the property for "vacation residence" (i.e. members and staff of SDA's school and church) than those permitted to use "dwellings" (i.e., faculty, administrative staff, students, and employees). Further, recognizing this ambiguity in the language of Paragraph 16 does not frustrate otherwise permissible uses of the Property, because any such limitation would apply only to the use of "dwellings," which are defined broadly as any structure in which a person lives, a residence, or an abode. *Black's Law Dictionary* 582 (9th ed. 2009) (defining "dwelling-house").

Thus, the terms of Paragraph 16 are reasonably susceptible to more than one interpretation, there are genuine issues of material fact regarding the intent of the drafters, and summary judgment is therefore inappropriate. Although the ICA correctly vacated summary judgment in favor of Wong and remanded the case for further proceedings on the issue of cabin rentals, it did so for the wrong reason.[12] We vacate the ICA's judgment as to Count I of the Complaint (cabin rentals), and remand the case to the circuit court for a determination of whether the Lease permits SDA to use cabins as vacation residences for the general public. In making this determination, the fact-finder may consider additional evidence, including parol evidence, regarding the intent of the parties at the time of drafting.

### 3. The Lease Does Not Prohibit Commercial Activities

 Although our analysis of Paragraph 16 effectively disposes of Wong's questions

on certiorari, we address several additional arguments to provide guidance on remand.

Wong claims that the Lease prohibits SDA from engaging in commercial uses of the Property, including renting vacation residences to the public, because the five uses enumerated in Paragraph 16 are all "noncommercial." This argument, however, lacks merit. A use that is educational, agricultural, recreational or related to health care is not, by design, noncommercial. A permissible recreational use does not cease to be recreational simply because SDA charges a fee.[13]

Furthermore, neither Paragraph 16 nor the remainder of the Lease expressly or implicitly prohibits SDA from conducting commercial activities on the Property. If the parties had intended to include such a prohibition, they could have easily done so. Based on the plain language of the Lease, we conclude that SDA is not prohibited from collecting revenue from otherwise permissible uses of the Property.

### B. Count I of Wong's Counterclaim (Termination)

 Because the fact-finder could determine, on remand, that Paragraph 16 of the Lease prohibits the use of cabins by the general public, we must address whether Wong's purported claim for termination of the Lease was effective.

Wong contends that he was entitled to terminate the Lease due to SDA's "intentional, willful, or grossly negligent" breach in renting cabins to the public. SDA, however, argues that the Lease cannot be terminated because it timely cured any alleged violations within thirty days of receiving written notice from Wong.

---

12. The ICA explained that there were disputed issues of material fact as to whether cabins were used by SDA solely for the purpose of vacation rentals. Insofar as Wong contended that SDA rented cabins to the public for both long-term and short-term use, the ICA concluded that SDA had failed to present sufficient facts to dispose of this claim on summary judgment.

13. As the ICA correctly explained: "Paragraph 16 plainly permits [SDA] to use the Property to run a school, farm, or medical clinic. Whether [SDA] charges students a tuition, sells the harvest, or charges patients fees for the provision of medical treatment is merely derivative of and incidental to these uses."

Absent ambiguity, contract terms must be interpreted according to their plain meaning. *Cho Mark Oriental Food*, 73 Haw. at 520, 836 P.2d at 1064. Under the terms of the Lease, Wong possesses a right to terminate if SDA ceases to use the Property for a permissible purpose. The right to terminate, however, is subject to Paragraph 26, which provides SDA thirty days within receipt of written notice to remedy any alleged breach. It is undisputed that Wong first demanded SDA cease its practice of renting cabins to the public in a letter dated March 6, 2002.[14] SDA informed Wong that it would cease its vacation rental operations on March 13, 2002. Under these circumstances, SDA timely cured the alleged breach within the required time frame and Wong was not entitled to terminate the Lease.

■ Wong's reliance on *Food Pantry*, 58 Haw. at 613–14, 575 P.2d at 875–76, and *Aickin*, 84 Hawai'i at 455–56, 935 P.2d at 1000–01, is misplaced. Those cases recognized a policy against forfeiture, despite lessors entitlement to terminate under the express terms of a lease. As we explained in *Food Pantry*, "[e]quity does not favor forfeitures, and where no injustice would thereby be visited upon the injured party, equity will award him compensation rather than decree a forfeiture against the offending party." 58 Haw. at 614, 575 P.2d at 876. In this case, the express terms of the lease do not permit Wong to terminate where SDA timely remedies an alleged breach within thirty days of receiving written notice.

Thus, even if the fact-finder determines that SDA's vacation rentals violated the Lease, Wong was not entitled to termination. We therefore affirm the ICA's judgment in favor of SDA on Count I of the Counterclaim.

## C. Counts II and III of Wong's Counterclaim (Breach of Contract and Unjust Enrichment)

■ If, on remand, the fact-finder concludes that Paragraph 16 of the Lease prohibits the use of cabins by the general public,

it will also have to address Wong's claim that he is entitled to an award of monetary damages for breach of contract or disgorgement of profits from SDA's rental operations.

SDA maintains that Wong is not entitled to damages because the Lease does not contain a penalty provision, the court cannot rewrite the terms of the Lease to require payment of percentage rents, and it did not profit from its rental operations because those funds were used to support the School. SDA also argues that unjust enrichment is inappropriate as a quasi-contract claim where there is a valid, enforceable contract between the parties.

The ICA concluded that Wong could not seek damages or disgorgement by virtue of the fact that he was not entitled to termination of the Lease. A claim for breach of contract or unjust enrichment, however, is distinct from a claim for termination of the Lease.

■ A claim for breach of contract allows a party to recover just compensation for any loss or damage that is the natural and proximate consequence of an opposing party's breach. *Amfac v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 128, 839 P.2d 10, 32 (1992). A claim for unjust enrichment permits a party to seek restitution for benefits improperly conferred on an opposing party as a result of a wrongful act. *Porter v. Hu*, 116 Hawai'i 42, 55, 169 P.3d 994, 1007 (App.2007) (citing *Durette v. Aloha Plastic Recycling*, 105 Hawai'i 490, 100 P.3d 60 (2004)). In deciding whether a party is entitled to restitution, the court is guided by its objective to prevent injustice. *Small v. Badenhop*, 67 Haw. 626, 636, 701 P.2d 647, 654 (1985) ("One who receives a benefit is of course enriched, and he would be unjustly enriched if its retention would be unjust." (Citation omitted.)).

If the fact-finder concludes that SDA violated the Lease by renting cabins to the public, Wong may be entitled to an award of monetary damages for breach of contract and/or equitable relief in the form of dis-

---

14. There is some evidence that the Trusts were aware of SDA's practice of renting cabins to the public between 1984 and 2000. Prior to Wong's March 6, 2002 letter, however, there was no communication from the Trusts that these rentals violated the terms of the Lease.

gorgement of profits from SDA's rental operations.[15] Accordingly, we vacate the ICA's judgment in favor of SDA on Counts II and III of the Counterclaim, and remand the case for further proceedings on these claims.

## D. Attorneys' Fees and Costs

In light of our decision that Paragraph 16 is ambiguous, we conclude that neither party has prevailed on appeal. Therefore, the ICA did not err in vacating the circuit court's order awarding attorneys' fees and costs to Wong. Because SDA has not prevailed on appeal, however, we vacate the ICA's order awarding costs to SDA. *See* Hawai'i Rules of Appellate Procedure Rule 39(a) ("[I]f a judgment is affirmed in part and reversed in part, or is vacated, or a petition granted in part and denied in part, the costs shall be allowed only as ordered by the appellate court.")

## V. Conclusion

We conclude that the ICA correctly vacated summary judgment in favor of Wong on Count I of the Complaint (cabin rentals), but for the wrong reasons. The ICA also correctly affirmed summary judgment in favor of SDA on Count I of the Counterclaim (termination). However, in light of our decision to remand the case on the permissibility of cabin rentals, we conclude that the ICA erred in affirming summary judgment in favor of SDA on Counts II and III of the Counterclaim (breach of contract and unjust enrichment).

Finally, we conclude that the ICA correctly vacated the circuit court's order awarding attorneys' fees and costs to Wong. We also vacate the ICA's order awarding costs on appeal to SDA because a prevailing party has yet to be determined.

We therefore affirm in part and vacate in part the ICA's judgment on appeal, and remand this case to the circuit court for further proceedings consistent with this opinion.

15. It is unclear why the circuit court granted summary judgment in favor of SDA on Counts II and III of the Counterclaim, while granting summary judgment in favor of Wong on Count I of the Complaint.

Dissenting Opinion by POLLACK, J., in which ACOBA, J., joins.

I agree with the majority that "[t]he main issue before this court is whether Paragraph 16 of the Lease prohibits SDA's practice of renting cabins, as vacation residences, to members of the public not affiliated with the Church or School." Majority Opinion at 46–47, 305 P.3d at 462–63. However, I respectfully disagree with the majority's conclusion that Paragraph 16 is ambiguous. I believe that Paragraph 16 unambiguously permits cabin rentals to the general public based on: 1) the plain meaning and common application of the word "including"; 2) standard rules of contract interpretation; 3) well-established principles of landlord-tenant law providing that lessees are permitted to use the demised premises for any valid and lawful purpose absent an express or necessarily implied use restriction; and 4) the incongruous effects of interpreting the Lease in the manner propounded by the majority as a reasonable construction of the Lease.

## I.

The first sentence of Paragraph 16 provides: "The demised premises shall be used only for educational, recreation (including vacation residence for members and staff of Lessee's school and church), agricultural, health care and humanitarian uses." The majority concludes that this sentence is ambiguous and could be reasonably construed to either exclude or permit individuals who are not "members and staff of Lessee's school and church" from using the demised premises for vacation residences. Majority Opinion at 46–47, 305 P.3d at 462–63. As support for this proposition, the majority relies on two justifications: 1) that the word "including" could be construed to be a term of enlargement or limitation; and 2) the canon of construction *expressio unius est exclusio alterius,* meaning "the express mention of a particular provision may imply the exclusion of that which is not included." *Id.* Re-

spectfully, neither justification demonstrates that the language of the Lease is ambiguous.

### A.

First, the majority cites the fact that the sixth edition of *Black's Law Dictionary* defines "including," when used in the context of statutes, as either a term of enlargement or limitation, depending on context. Majority Opinion at 46–47, 305 P.3d at 462–63. However, the fact that a dictionary provides multiple definitions of a word used in a contract does not render the contract ambiguous. Ambiguity in a contract "is found to exist . . . only when the contract taken as a whole, is reasonably subject to differing interpretation." *Sturla, Inc. v. Fireman's Fund Ins. Co.*, 67 Haw. 203, 209–10, 684 P.2d 960, 964 (1984) (quotation marks and brackets omitted). "[M]ere complexity," *id.* at 209, 684 P.2d at 964, or "the parties' disagreement as to the meaning of a contract or its terms" does not create an ambiguity. *State Farm Fire & Cas. Co. v. Pacific Rent–All, Inc.*, 90 Hawai'i 315, 324, 978 P.2d 753, 762 (1999). Thus, "an agreement should be construed as a whole and its meaning determined from the entire context and not from any particular word, phrase or clause." *Maui Land & Pineapple Co. v. Dillingham Corp.*, 67 Haw. 4, 11, 674 P.2d 390, 395 (1984) (quotation marks and brackets omitted). In this case, as discussed herein, Paragraph 16 as a whole demonstrates no ambiguity as to the permissible uses of the demised premises, given that the only interpretation that logically comports with the plain meaning of the Lease terms is one permitting the SDA's cabin rentals to the general public.

Second, the most recent edition of *Black's Law Dictionary* provides: "The participle *including* typically indicates a partial list. [ . . . ] But some drafters use phrases such as *including without limitation* and *including but not limited to*—which mean the same thing." *Black's Law Dictionary* 831 (9th ed. 2009) (underline emphasis added). This is consistent with the definition of "including" provided by other sources. *See* Nat'l Reporter Sys., *Judicial and Statutory Definitions of Words and Phrases* 3500 (1904) (" 'Including' is not a word of limitation.

Rather [it is] a word of enlargement, and in ordinary signification implies that something else has been given beyond the general which precedes it. *Neither is it a word of enumeration[.]*") (emphasis added); *Webster's Third New Int'l Dictionary* 1143 (1993) (defining "include" to mean "to place, list, or rate as a part or component of a whole or of a larger group, class, or aggregate").

Third, this court has consistently held that the term "including" is "ordinarily a term of enlargement, not of limitation[.]" *Schwab v. Ariyoshi*, 58 Haw. 25, 35, 564 P.2d 135, 141 (1977). We have explained that "the term, 'including' expresses 'an enlargement and has the meaning of *and* or *in addition to*, or merely specifies a particular thing already included within the general words theretofore used.'" *Lealaimatafao v. Woodward–Clyde Consultants*, 75 Haw. 544, 556, 867 P.2d 220, 226 (1994) (brackets omitted) (emphasis in original) (quoting *Black's Law Dictionary* 763 (6th ed. 1990)). Thus, the *Lealaimatafao* court held that by using the term "including" in a statute, the legislature intended to enumerate the types of claims that could be brought, without limiting claims to those listed. 75 Haw. at 556, 867 P.2d at 226. The court held that "[t]he term 'including' in no way implies exclusivity." *Id.* (emphasis added). Accordingly, rather than being an "all-embracing definition," the term "including" "connotes simply an illustrative application of the general principle." *In re Waikoloa Sanitary Sewer Co.*, 109 Hawai'i 263, 274, 125 P.3d 484, 495 (2005) (quotation marks and brackets omitted).

This definition of "including" is consistent with the meaning given to the term by the U.S. Supreme Court and courts in other jurisdictions. *See, e.g., Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100, 62 S.Ct. 1, 86 L.Ed. 65 (1941) ("the term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle"); *Puerto Rico Mar. Shipping Auth. v. Interstate Commerce Comm'n*, 645 F.2d 1102, 1112 n. 26 (D.C.Cir.1981) ("It is hornbook law that the use of the word 'including' indicates that the specified list . . . is illustrative, not exclusive"); *Beaver Dam Cmty. Hosps., Inc. v.*

*City of Beaver Dam,* 344 Wis.2d 278, 822 N.W.2d 491, 495 (Wis.Ct.App.2012) (noting that Wisconsin courts have consistently held that "include" is a "term of illustration or inclusion, not one of limitation or exclusion"); *Paxson v. Bd. of Educ. of Sch. Dist. No. 87, Cook Cnty., Ill.,* 276 Ill.App.3d 912, 213 Ill. Dec. 288, 658 N.E.2d 1309, 1314 (1995) (finding "the word 'including,' in its most commonly understood meaning, to be a term of enlargement, not of limitation"); *Pro–Art Dental Lab, Inc. v. V–Strategic Group, LLC,* 986 So.2d 1244, 1257 (Fla.2008) ("The phrase 'including motions to quash' logically implies that motions to quash are included in addition to, not to the exclusion of, other permissible motions.").

Fourth, in the above Hawai'i cases interpreting the term "including," the court did not apply the maxim of *expressio unius est exclusio alterius,* which the majority relies on. See Majority Opinion at 47, 305 P.3d at 463. *Expressio unius est exclusio alterius* is a canon of construction meaning "that to express or include one thing implies the exclusion of the other, or of the alternative." [1] *Black's Law Dictionary* 661 (9th ed. 2009). "For example, the rule that 'each citizen is entitled to vote' implies that noncitizens are not entitled to vote." *Id.*

However, according to the article cited by the majority opinion, *expressio unius est exclusio alterius* means that "[i]f one or more specific items are listed, without any more general or inclusive terms, other items although similar in kind are excluded." Edwin W. Patterson, *The Interpretation and Construction of Contracts,* 64 Colum. L. Rev. 833, 853–54 (1964) (emphasis added). In this case, the item that is listed in the parenthetical clause of the first sentence is preceded by a general and inclusive term, "including," which has been defined by this court to illustrate an example of the general definition or principle rather than to imply exclusivity. Thus, the maxim of *expressio unius est exclusio alterius* is not applicable in interpreting the first sentence of Paragraph 16. *See*

*St. Paul Mercury Ins. Co. v. Lexington Ins. Co.,* 78 F.3d 202, 206–07 (5th Cir.1996) ("[W]e are not convinced that the rule of *expressio unius est exclusio alterius* applies in the instant case, as the challenged list of provisions in [the] contract is prefaced by the word 'including,' which is generally given an *expansive* reading, even without the additional if not redundant language of 'without limitation.' ") (emphasis in original) (footnote omitted); *Dunphy Boat Corp. v. Wis. Emp't Relations Bd.,* 267 Wis. 316, 64 N.W.2d 866, 869–70 (1954) (holding that *expressio unius est exclusio alterius* was inapplicable to interpret parenthetical clause in statute using the term "including").

The case cited by the majority opinion in support of the application of the maxim, *Tsunoda v. Young Sun Kow,* 23 Haw. 660 (Terr. 1917), is entirely distinguishable. Majority Opinion at 47, 305 P.3d at 463. In that case, a lease demised to the lessee four parcels of land, with an artesian well located on one of the parcels. 23 Haw. at 661–63. The lease was accompanied by a stipulation that the lessee had the right to use as much of the water from the well on the lands demised "as shall be necessary for the purpose of irrigating the lands and for domestic purposes." *Id.* at 663. Given this language, the court held that "[u]nder the rule *expressio unius est exclusio alterius* the surplus water from the well, that is, all above the amount necessary for the irrigation of the lands demised to the defendant and for his domestic purposes, was excluded from the operation of the lease." *Id.* at 665. This is clearly distinct from the Lease in this case, given the use of the term "including."

Therefore, the word "including" is plainly a term of illustration or inclusion rather than a term of limitation or exclusion. The first sentence of Paragraph 16 provides that the demised premises may be used for "recreation." Applying the plain meaning of "including," the parenthetical ("including vacation residence for members and staff of

---

**1.** "Canons of construction provide some guidance, but cannot anticipate all of the variables which converge in a concrete case." *Edwards v. United States,* 583 A.2d 661, 664 (D.C.1990). *See Int'l Sav. & Loan Ass'n, Ltd. v. Wiig,* 82 Hawai'i 197, 201, 921 P.2d 117, 121 (1996) (*expressio unius est exclusio alterius* "exists only as an aid to statutory interpretation and its application should be limited to ascertaining legislative intent which is not otherwise apparent").

Lessee's school and church") constitutes an example of a permitted recreational use but in no way limits recreational use to the identified group.

### B.

The majority nevertheless contends that "[i]f the parties had intended to identify vacation residence as an example of recreational use, they could have done so without referring to a particular category of persons entitled to use those vacation residences." Majority Opinion at 47, 305 P.3d at 463. According to the majority, reading the parenthetical as stating an example of a permitted recreational use of the property "renders the reference 'to members and staff of Lessee's school and church' superfluous." *Id.* at 47 n. 11, 305 P.3d at 463 n. 11.

The logical extension of the majority's argument is that clauses following the term "including" will always be considered superfluous if the term is given its ordinary meaning as a word of inclusion. Fundamentally, this would mean that the use of the term "including," or any equivalent word or phrase-"such as," "for example,"—in a contract would result in the contract being deemed ambiguous. Such an interpretation would effectively undermine the purpose of employing these terms, which are used precisely to ensure that there is no ambiguity regarding the scope of the general preceding category.

Additionally, postulating that the parties could have achieved the same effect (permitting the general public to use the premises for vacation residences) by eliminating any reference to a particular group is beside the point. The dispositive issue is what the contract actually expresses. The Lease in this case, by using the term "including," does not exclude individuals other than those referenced from using the premises for vacation residence. In any event, if one were to consider what the parties could have done, it may be observed that if the parties had desired to achieve the result proposed by the majority, then the parenthetical could have been drafted without difficulty to expressly prohibit the general public, as follows:

The demised premises shall be used only for educational, recreation (~~including~~ **except** vacation residence **is permitted only** for members and staff of Lessee's school and church), agricultural, health care and humanitarian purposes.

As the Lease was drafted, however, the parties did not expressly prohibit any group from using the demised premises for vacation residences. The only term used to describe the use of the property for vacation was "including." Our prior cases have interpreted the word "including" consistently with its common definition, such that the word indicates a partial list and is essentially equivalent to the phrase "including without limitation" and "including but not limited to." The majority's finding that the term is ambiguous undermines the holdings of these cases, based on an alternative dictionary definition that does not comport with the general use or meaning of "including" and based upon the application of a canon of construction that would result in the word "including" invariably meaning the opposite of its common and accepted definition. Thus, the majority's analysis may have the adverse and unintended consequence of rendering many contracts "ambiguous" on the same basis.

### II.

Interpreting the first sentence of Paragraph 16 to permit cabin rentals to the general public is also consistent with the general rule of landlord-tenant law, that a tenant is entitled to use the premises for any lawful purpose absent an express or necessarily implied restriction:

[A] lessee is entitled to use demised premises for any lawful or valid purpose without interference on the part of the lessor, so long as such use is not forbidden by an express provision or some necessarily implied construction of the lease, and does not amount to waste or destruction of the property.

86 A.L.R. 4th 263–64 (1991) (emphasis added) (footnote omitted). *See* 49 Am.Jur.2d *Landlord and Tenant* § 404 (2006) ("In order to establish a restriction, express language or language from which a restriction is clearly

implied must be shown") (footnotes omitted); *Pires v. Phillips*, 31 Haw. 720, 722 (Terr.1930) ("There is nothing in the lease which binds the lessee to use the premises for any particular purpose. He may therefore use them for any purpose he pleases[.]").

Thus, "[i]t is well established that words merely descriptive of the character of leased premises, although indicative of a particular use, do not preclude the tenant from using the premises for any other lawful purpose, or, at least, for any purpose which is consistent with the character of the property." [2] 86 A.L.R. 4th 264 (1991) (footnote omitted). *See* 52A C.J.S. *Landlord and Tenant* § 793 (2012) ("[O]rdinarily, . . . a lease for a specific purpose is generally regarded as 'permissive' instead of 'restrictive' and does not limit the use of the premises by the lessee to such purposes.") (footnotes omitted). *See, e.g., Alchemy Commc'ns Corp. v. Preston Dev. Co.*, 148 N.C.App. 219, 558 S.E.2d 231, 235 (2002) ("A mere statement of the purpose of a lease or words that describe the use of the premises are deemed permissive rather than restrictive"); *Bennett v. Waffle House, Inc.*, 771 So.2d 370, 372 (Miss.2000) (en banc) (lease provision setting forth use of property, "absent a clear and specific indication that the landlord intended to limit the tenant's use of the property, is generally permissive and not restrictive") (quotation marks omitted); *Ray–Ron Corp. v. DMY Realty Co.*, 500 N.E.2d 1163, 1165 (Ind.1986) ("A lease of property which specifies the purpose of the lease but does not prohibit other purposes is deemed permissive only"); *Cox v. Ford Leasing Dev. Co.*, 170 Ga.App. 81, 316 S.E.2d 182, 183 (1984) ("a lease for a specific purpose is generally regarded as permissive instead of restrictive") (quotation marks omitted).

In this case, the first sentence of Paragraph 16 specifically permits the use of the demised premises by members and staff of the SDA's school and church for vacation residences. Pursuant to the general rule,

this clause is permissive in nature and indicates that the lessor was aware of this intended use of the property. *See Forman v. United States*, 767 F.2d 875, 880 (Fed.Cir. 1985) (lease provision setting forth the use of the property, "absent a clear and specific indication that the landlord intended to limit the tenant's use of the property," indicates "that the landlord is aware of and sanctions the tenant's intended use, but does not limit tenant to that use alone"). Thus, the first sentence does not expressly prohibit recreational use of the demised premises by individuals other than members and staff of the SDA's school and church.

In cases where courts have implied a use restriction from the language of the lease, they have held that "[e]xpress words of restriction are not necessary, where the language used shows that no other use was to be permitted than that specified." *Elca of New Hampshire, Inc. v. McIntyre*, 129 N.H. 114, 523 A.2d 90, 92 (1987) (quotation marks omitted); *Kaiser v. Zeigler*, 115 Misc. 281, 187 N.Y.S. 638, 640 (N.Y.App. Term 1921). For example, express words of restriction may not be necessary when the lease uses language such as " 'sole' or 'only' or 'and for no other purpose'," to describe the permitted uses of the land. 49 Am.Jur.2d *Landlord and Tenant* § 405 (2006) (footnotes omitted). In this case, the Lease does not use restrictive terms regarding the use of vacation residences on the property; rather, the only term the Lease uses in describing the use of the demised premises for vacation residence is the term "including," which, as explained above, is a term of enlargement rather than limitation.

In contrast, in a case where the lease provided that the premises were leased "for the purpose of operating a restaurant for the sale and consumption . . . of food and non-alcoholic beverages," the court held that the lease impliedly prohibited the sale of alcoholic beverages, despite the lack of a limiting

---

**2.** *See, e.g., Rapids Assocs. v. Shopko Stores, Inc.*, 96 Wis.2d 516, 292 N.W.2d 668, 670 (Wis.Ct. App.1980); *Noon v. Mironski*, 58 Wash. 453, 108 P. 1069, 1070 (1910); *Baron Bros., Inc. v. Nat'l Bank of S.D. Sioux Falls*, 83 S.D. 93, 155 N.W.2d 300, 303 (1968); *Hyatt v. Grand Rapids Brewing Co.*, 168 Mich. 360, 134 N.W. 22, 23 (1912);

*Beck v. Giordano*, 144 Colo. 372, 356 P.2d 264, 265 (1960) (per curiam); *Silkey v. Malone*, 123 Ind.App. 395, 111 N.E.2d 665, 667 (1953) (in banc); *Bevy's Dry Cleaners & Shirt Laundry, Inc. v. Streble*, 2 Ohio St.2d 250, 208 N.E.2d 528, 531–32 (1965).

term such as "only." *McIntyre,* 523 A.2d at 92 (emphasis added). The court explained, "Beverages offered for sale in restaurants may either be non-alcoholic or alcoholic beverages. There are no other available beverage alternatives." *Id.* In this case, permitting the use of the premises for vacation residences by "members and staff of Lessee's school and church" is not mutually exclusive with permitting all other individuals to engage in the same use, particularly given the use of the word "including" to describe the specified use.

Other courts have held that a restriction may be implied from the language of the lease if such a restriction is "indispensable to carry into effect the lease's purpose," *Marini v. Ireland,* 56 N.J. 130, 265 A.2d 526, 533 (1970), or was "so clearly within the parties' contemplation that they deemed it unnecessary to express it." *Mercury Inv. Co. v. F.W. Woolworth Co.,* 706 P.2d 523, 532 (Okla. 1985). Here, it cannot be said that the limitation of vacation residences from use by the general public may be implied from the language of Paragraph 16, as such a restriction is not "indispensable" to using the premises for educational, recreational, agricultural, health care and humanitarian purposes. Additionally, the language of the Lease does not demonstrate that such a restriction was "so clearly within the parties' contemplation" that it was unnecessary to express it in the Lease.

Accordingly, the plain language of the first sentence of Paragraph 16 does not prohibit the use of the demised premises for vacation residences by individuals who are not "members and staff of Lessee's school and church." In accordance with the general rule of landlord-tenant law, absent an express restriction in the Lease or language from which a restriction must be necessarily implied, SDA, as the lessee, is entitled to use the premises

for any lawful or valid purpose. Thus, applying well-established principles of property law, the Lease in this case unambiguously permits the SDA to rent cabins to the general public under the recreational use provision of Paragraph 16.

## III.

The majority concludes, however, that the meaning of the first sentence of Paragraph 16 is "particularly ambiguous" when read in context with the second sentence, which provides: "No dwellings shall be constructed or used on the demised premises except for faculty, administrative staff, students and employees." Majority Opinion at 47, 305 P.3d at 463. The majority reasons that the meaning of the word "dwellings" is ambiguous, and "it is possible that Paragraph 16's restriction on the construction and use of 'dwellings' states the general rule, while the parenthetical reference to 'vacation residence' provides a limited exception thereto." *Id.* at 47–48, 305 P.3d at 463–64. Respectfully, I do not believe that the language of Paragraph 16 is "reasonably susceptible" to such an interpretation, as it would render the parenthetical in the first sentence partially superfluous and unduly restrict expressly permissible uses of the premises.[3]

## A.

The majority reasons that the term "dwellings" is ambiguous, "insofar as it could refer broadly to a structure in which people live (as Wong contends) or, more specifically, to a place of primary or permanent residence (as SDA contends)." Majority Opinion at 47, 305 P.3d at 463. The majority finds that it is therefore "possible" that the second sentence states the general rule while the parenthetical reference to "vacation residence" provides

---

**3.** I do not address whether construing the Lease to prohibit use of the demised premises by individuals who are not members of the SDA's church would violate public accommodation laws pursuant to HRS § 489–3 (2008), which prohibits "[u]nfair discriminatory practices that deny, or attempt to deny, a person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation on

the basis of … religion[.]" A "place of public accommodation" means "a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the general public as customers, clients, or visitors." HRS § 489–2 (2008).

a very limited exception. *Id.* at 47–48, 305 P.3d at 463–64.

As with the interpretation of the term "including," the fact that the word "dwellings" has different meanings (as a primary or short-term residence) does not by itself create an ambiguity in the Lease.[4] The word must be interpreted in context, as an ambiguity may only be found to exist when considering the contract as a whole. *Sturla, Inc. v. Fireman's Fund Ins. Co.*, 67 Haw. 203, 209–10, 684 P.2d 960, 964 (1984).

In this case, as the ICA recognized, the only logical definition of the word "dwelling" in the context of the Lease is a primary or permanent residence, rather than generally any structure a person inhabits. First, the fact that the second sentence lists only those individuals who would be expected to permanently or primarily reside on the premises (faculty, administrative staff, students and employees), suggests that the term "dwelling" is used to connote a structure for permanent residence and not vacation residences. Conversely, the second sentence does not include those individuals who would not be expected to permanently reside on the premises but who would be expected to be able to enjoy recreational use of the premises; for example, parents of the students attending the school, children who are members of the church but who do not attend the school, and other church members who are not faculty, staff, students or employees.

Second, the meaning of "dwellings" is clear when looking at the two sentences comprising Paragraph 16 and interpreting their plain meaning so that they support, rather than defeat, each other. *See* 52A C.J.S. *Landlord and Tenant* § 794 (2012) ("[I]n arriving at the meaning of restrictions, the whole lease, and not single clauses, should be considered so that, when the restrictions are considered in connection with other parts of the instrument, they will tend to support, rather than defeat, it.") (footnotes omitted). The parenthetical expressly permits all church members to use the premises for "vacation residences," while the second sentence restricts the construction and use of "dwellings" to faculty, administrative staff, students, and employees. As the ICA recognized, it would be "illogical that a given use of the Property (vacation residence by church members) should be expressly permitted in one sentence but forbidden in the next." Memorandum Opinion at 13–14.

### B.

The majority, however, proposes that Paragraph 16 could reasonably be construed so that the "restriction on the construction and use of 'dwellings' states the general rule, while the parenthetical reference to 'vacation residence' provides a limited exception thereto." Majority Opinion at 48, 305 P.3d at 464. Pursuant to this interpretation, the term "dwellings" would establish a broad category of structures in which people reside (for short or long-term residence) that is inclusive of "vacation residences." Although this interpretation may avoid the inconsistencies between the parenthetical and the second sentence that were identified by the ICA, it would also have the effect of rendering the parenthetical superfluous.

Under the majority's proposed interpretation, the term "dwellings" is inclusive of "vacation residences," so that even without the parenthetical, vacation residences are prohibited from being used by anyone other than faculty, administrative staff, students and employees.

First, if this were the case, then the second sentence expressly permits vacation residences to be constructed and used by administrative staff, faculty and employees. Accordingly, there would be no need for the parenthetical to carve out an exception for "staff of Lessee's school and church" to use vacation residences. The majority's proposed interpretation of the Lease would render the reference to "members and staff of

---

4. "Dwelling-house," which is often shortened to "dwelling," means "[t]he house or other structure in which a person lives; a residence or abode." *Black's Law Dictionary* 582 (9th ed. 2009). An "abode" is a "home" or "a fixed place of residence." *Id.* at 6. "Residence" is defined as "[t]he act or fact of living in a given place for some time," and typically "means bodily presence as an inhabitant in a given place[.]" *Id.* at 1423.

Lessee's school and church" superfluous. Such a result is contrary to the well-established principle that contracts should be interpreted to give meaning and effect to all contract terms. *See Stanford Carr Dev. Corp. v. Unity House, Inc.*, 111 Hawai'i 286, 297, 141 P.3d 459, 470 (2006) (this court has "long expressed our disapproval of interpreting a contract such that any provision be rendered meaningless"); Restatement (Second) of Contracts § 203 (1981) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect").

Second, reading the two sentences of Paragraph 16 in concert so that they support rather than defeat one another suggests that the parties understood the category of "dwellings" to be distinct from the category of "vacation residences," and used the parenthetical to underscore this distinction. The majority argues that interpreting the parenthetical to state an example of a permitted recreational use, "without explaining the import of this language," would render the parenthetical reference to "members and staff of Lessee's school and church" superfluous. Majority Opinion at 23 n.11. However, the rationale for specifically identifying members and staff of the SDA's school and church as examples of individuals who could use the demised premises for vacation residences may have been to clearly differentiate the use of "vacation residences" from the use of "dwellings." Because the second sentence restricts the use of "dwellings" to faculty, administrative staff, students and employees, the parties may have wanted to ensure that this restriction would not be interpreted to exclude members and staff of the school and church from using cabin rentals. Thus, the parties would have used the word "including" to accomplish the result of ensuring that members and staff of the school and church could use the premises for vacation residences, thereby underscoring the inclusive nature of the recreational category of permitted uses. The majority's inordinately expansive reading of the second sentence may have been precisely what the parties intended to

avoid by including the parenthetical reference to members and staff of the SDA's school and church.

Third, the majority's proposed interpretation would have the effect of unduly restricting the clearly expressed purposes of the Lease. Under the majority's proposed interpretation, members of the general public would not be permitted to use the cabin rentals, vacation residences, or any structure in which people temporarily or permanently reside. Such a restrictive interpretation is at odds with the first sentence of Paragraph 16, which broadly permits the demised premises to be used for educational, recreational, agricultural, health care and humanitarian purposes. Restricting short-term housing to members and staff of the SDA's school and church would adversely affect the SDA's ability to use the premises for these stated purposes. For example, if the SDA offered health care services on the premises, consistent with the first sentence of Paragraph 16, the SDA would be prohibited from permitting a sick person to temporarily stay in a cabin or structure, simply because the person was not affiliated with the SDA's church or school. If the SDA offered humanitarian services that necessitated overnight care,[5] such as providing shelter for the homeless or for victims of domestic violence, then the SDA would be similarly burdened by the majority's proposed interpretation of the Lease.

Our main objective in interpreting contracts is to ascertain and give effect to the intention of the parties, "as manifested by the contract in its entirety." *Brown v. KFC Nat'l Mgmt. Co.*, 82 Hawai'i 226, 240, 921 P.2d 146, 160 (1996) (quotation marks omitted). We have also said that "[i]n construing a lease we must avoid an <u>unreasonable</u> interpretation if that can be done consistently with the tenor of the agreement and choose the most obviously just interpretation as the presumed intent." *Broida v. Hayashi*, 51 Haw. 493, 496, 464 P.2d 285, 288 (1970) (emphasis added). In this case, I believe that the Lease does not limit the use of "vacation

---

5. The adjective "humanitarian" means "zealously concerned for or active in the promotion of human welfare and [especially] of social reform." *Webster's Third New Int'l Dictionary* 1100 (1993).

residences" on the premises and restricts only the use of "dwellings," meaning long-term or primary residences, to faculty, administrative staff, students and employees. This interpretation is consistent with the tenor of the Lease as a whole, which clearly evidences the parties' intent to allow the SDA to use the premises for broad purposes benefitting a wide range of individuals, regardless of their affiliation with the SDA's church or school. Consequently, I believe that the Lease unambiguously permits the SDA's rental of cabins to members of the general public.

### IV.

Based on the foregoing, I respectfully dissent from the majority's holding that Paragraph 16 is ambiguous. I would therefore conclude that the ICA correctly vacated summary judgment in favor of Wong on Count I of the Complaint and affirm the ICA's judgment on appeal.